No. 24-2143, No. 24-2168, No. 24-2391
_____

# In the United States Court of Appeals for the Eighth Circuit
_____

Rhonda Burnett, et al.,

Plaintiffs – Appellees,

v.

The National Association of Realtors, HomeServices of America, BHH Affiliates, LLC, and HSF Affiliates, LLC,

Defendants,

v.

Keller Williams Realty, Inc., Anywhere Real Estate Inc.(f/k/a Realogy Holdings Corp.), and RE/MAX, LLC,

Defendants – Appellees,

v.

James Mullis, Spring Way Center, LLC, and Benny D. Cheatham, et al.,

Objectors – Appellants

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
Case No. 4:19-cv-00332 (SRB), Hon. Stephen R. Bough

_____

**ANYWHERE AND RE/MAX'S RESPONSE BRIEF**
_____

Aaron D. Van Oort
Kevin P. Wagner
Hannah M. Leiendecker
Anderson C. Tuggle
**FAEGRE DRINKER
BIDDLE & REATH LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Aaron.VanOort@faegredrinker.com
Kevin.Wagner@faegredrinker.com
Hannah.Leiendecker@faegredrinker.com
Anderson.Tuggle@faegredrinker.com

Stacey Anne Mahoney
**MORGAN LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000
Stacey.Mahoney@morganlewis.com

Kenneth M. Kliebard
**MORGAN LEWIS & BOCKIUS LLP**
110 North Wacker Drive
Chicago, IL 60606
Tel: (312) 324-1000
Kenneth.Kliebard@morganlewis.com

William T. McEnroe
**MORGAN LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5001
William.McEnroe@morganlewis.com

*Counsel for Defendant-Appellee Anywhere Real
Estate Inc. (f/k/a Realogy Holdings Corp.)*

Jeffrey A. LeVee
**JONES DAY**
555 S. Flower Street
Los Angeles, CA 90071
Tel: (213) 489-3939
jlevee@jonesday.com

Eddie Hasdoo
**JONES DAY**
110 North Wacker Drive
Chicago, IL 60606
Tel: (312) 269-4214
ehasdoo@jonesday.com

*Counsel for Defendant-Appellee RE/MAX,
LLC*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

As this antitrust litigation neared trial in fall 2023, Defendant Anywhere Real Estate Inc. and Plaintiffs mediated to explore settlement. A settlement would be the first with any defendant. The time was right. The record was fully developed. Both sides faced trial risk—Plaintiffs a possible total loss, Anywhere possible bankruptcy-level damages. Plaintiffs demanded maximum settlement value and sweeping changes. To pay anything, Anywhere needed global peace. Resolving one part of the country, while leaving annihilating risk outstanding elsewhere, would be pointless. And settling only some of the class members' antitrust claims, leaving the same people free to sue Anywhere again based on the same alleged conspiracy, would be intolerable.

With difficulty, the parties reached agreement: $83.5 million for a nationwide settlement releasing all claims arising from the alleged conspiracy. Settlement was announced September 5. A plan of allocation was deferred because more settlements with the same class members were anticipated. On September 18, RE/MAX settled for $55 million. At trial in October, Plaintiffs prevailed as to the other defendants but faced appellate risk. In February 2024, Keller Williams settled for $70 million. Class notice was sent. Nearly 200,000 people submitted claims by the fairness hearing. Only 12 objected. The same judge that presided over trial reviewed the settlements, found them "fair, reasonable, and adequate" under Fed. R. Civ. P. 23(e), and approved them. Only three objectors have appealed. No objection is well founded. This Court should affirm. If oral argument is allowed, Anywhere and RE/MAX request 15 minutes.

## ANYWHERE'S CORPORATE DISCLOSURE STATEMENT

As required by Fed. R. App. P. 26.1(a) and Eighth Circuit Rule 26.1A, Appellee Realogy Holdings Corp. states that:

1. Realogy Holdings Corp. is now named Anywhere Real Estate Inc. ("Anywhere").

2. Anywhere is a Delaware corporation and a publicly traded company. Anywhere has no parent companies.

3. BlackRock, Inc. and The Vanguard Group, Inc., both publicly held companies, each own more than 10% of Anywhere's stock.

## RE/MAX'S CORPORATE DISCLOSURE STATEMENT

As required by Fed. R. App. P. 26.1(a) and Eighth Circuit Rule 26.1A, Appellee RE/MAX, LLC states that:

1. RE/MAX, LLC is a limited liability company organized under the laws of Delaware.

2. RE/MAX, LLC's parent entity is RMCO, LLC, a Delaware limited liability company.

3. One of RMCO, LLC's parent companies, RE/MAX Holdings, Inc., is publicly traded on the New York Stock Exchange and owns more than 10% or more of RMCO, LLC's membership units.

4. RE/MAX, LLC does not have any subsidiaries that issue shares to the public.

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ............. i

TABLE OF AUTHORITIES ................................................................... v

STATEMENT OF ISSUES ..................................................................... 1

STATEMENT OF THE CASE ................................................................. 2

    A.    Plaintiffs allege and litigate a nationwide antitrust conspiracy to inflate prices paid to real estate agents and brokers. ................................. 2

    B.    Plaintiffs reach an icebreaker settlement with Anywhere shortly before trial, and settlement with RE/MAX quickly follows. ................... 5

    C.    The case proceeds to trial without Anywhere and RE/MAX, and Plaintiffs prevail against the remaining defendants. ................................. 10

    D.    The district court grants preliminary approval of the Anywhere and RE/MAX settlements, plus a post-trial Keller Williams settlement, and authorizes notice to be sent. ............................. 11

    E.    Nearly 200,000 class members submit claims, only 12 object, and the district court grants final approval. ....................................... 12

SUMMARY OF ARGUMENT ................................................................ 21

STANDARD OF REVIEW .................................................................... 23

ARGUMENT ..................................................................................... 24

I.    The District Court Acted Well Within Its Discretion In Approving The Anywhere And RE/MAX Settlements. ................................. 24

    A.    The Mullis objection fails. ........................................................ 26

        1.    The district court applied the correct legal standard. ................... 27

        2.    The district court correctly held that class members could, and did, release all their claims arising out of the alleged antitrust conspiracy. ........................................................... 29

            a.    Anywhere insisted on a release of all claims, and Plaintiffs agreed in unambiguous language. ...................... 30

            b.    Nothing prevents class members from releasing all their claims arising out of the same alleged conspiracy. .................................................................... 35

        3.    The district court properly rejected Mullis's request for separate representation and subclasses. .......................................... 42

4. The district court properly determined that the settlements themselves were fair and created a separate process for setting a plan of allocation. ............................................. 46

B. The Cheatham objection fails. .................................................. 50

1. The settlement notice was adequate. ............................................. 50

2. The settlements provide substantial monetary relief. ................... 50

3. The release of franchisees is valid. ................................................. 51

C. The Spring Way objection fails. ................................................ 52

1. The settlements cannot be judged by the subsequent verdict. ........................................................................................... 52

2. The final approval order complied with Rule 23(e)(2)(C)(ii). ....... 53

CONCLUSION ............................................................................................. 53

# TABLE OF AUTHORITIES

**Federal Cases**                                                            **Page(s)**

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997) ................................................................ 41, 48

*Batton v. Nat'l Ass'n of Realtors,*
2024 WL 689989 (N.D. Ill. Feb. 20, 2024) ............................ 4, 42

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan,*
203 F.3d 1028 (8th Cir. 2000) ........................................................ 9

*Burnett v. Nat'l Ass'n of Realtors,*
2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) ............................... 5

*Cohen v. Brown Univ.,*
16 F.4th 935 (1st Cir. 2021) ........................................................ 26

*Greco v. Ginn Dev. Co.,*
635 F. App'x 628 (11th Cir. 2015) .............................................. 25

*Grunin v. IHOP,*
513 F.2d 114 (8th Cir. 1975) ............................................ 24, 25, 49

*In re Agent Orange Prod. Liab. Litig.,*
818 F.2d 145 (2d Cir. 1987) ..................................................... 2, 46

*In re Apple Inc. Device Performance Litig.,*
50 F.4th 769 (9th Cir. 2022) ....................................................... 28

*In re Blue Cross Blue Shield Antitrust Litig.,*
85 F.4th 1070 (11th Cir. 2023) ................................................ 1, 27

*In re Cendant Corp. Litig.,*
264 F.3d 201 (3d Cir. 2001) ........................................................ 51

*In re Corrugated Container Antitrust Litig.,*
1981 WL 2093 (S.D. Tex. June 4, 1981) ..................................... 24

*In re Equifax Customer Data Sec. Breach Litig.,*
999 F.3d 1247 (11th Cir. 2021) .................................................. 44

*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*,
    357 F.3d 800 (8th Cir. 2004) ...................................................................*passim*

*In re Hewlett-Packard Co. S'holder Deriv. Litig.*,
    716 F. App'x 603 (9th Cir. 2017) ................................................................ 50

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) .................................................................. 43, 44

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg. Sales Pracs. & Prods. Liability Litig.*,
    91 F.4th 174 (4th Cir. 2024) ...................................................................... 40

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2024 WL 4224160 (E.D.N.Y. Sept. 18, 2024) ........................................ 39, 40

*In re Prudential Ins. Co. Am. Sales Pracs. Litig.*,
    148 F.3d 283 (3d Cir. 1998) .................................................................... 2, 25

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    846 F.3d 608 (8th Cir. 2017) ...................................................................... 48

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    892 F.3d 968 (8th Cir. 2018) ................................................ 20, 25, 41, 43

*In re Uponor, Inc. F1807 Plumbing Fittings Products Liability Litigation*,
    716 F.3d 1057 (8th Cir. 2013) .................................................................... 35

*Keil v. Lopez*,
    862 F.3d 685 (8th Cir. 2017) ...................................................................... 49

*Leeder v. Nat'l Ass'n of Realtors*,
    601 F. Supp. 3d 301 (N.D. Ill. 2022) ...................................................... 4, 39

*Marshall v. NFL*,
    787 F.3d 502 (8th Cir. 2015) ...................................................................... 21

*Matsushita Electric Industrial Co. v. Epstein*,
    516 U.S. 367 (1996) .................................................................................... 36

*Moehrl v. Nat'l Ass'n of Realtors*,
    2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ............................................... 4

*Moses v. New York Times Co.*,
   79 F.4th 235 (2d Cir. 2023) ................................................................ 26, 28

*N. Bottling Co. v. PepsiCo*,
   5 F.4th 917 (8th Cir. 2021) ............................................................ 31, 48, 51

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
   660 F.2d 9 (2d Cir. 1981) ........................................................ 36, 37, 38, 39

*Nosalek v. MLS Prop. Info. Network, Inc.*,
   575 F. Supp. 3d 199 (D. Mass. 2021) ................................................................ 4

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ................................................................ 41, 48

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ................................................................ *passim*

*Pollard v. Remington Arms Co., LLC*,
   896 F.3d 900 (8th Cir. 2018) ................................................................ 21

*Professional Firefighters Ass'n of Omaha v. Zalewski, Loc. 385*,
   678 F.3d. 640 (8th Cir. 2012) ................................................................ 43

*Prot. Life Ins. Co. v. Jim Orr & Assocs.*,
   384 F.3d 949 (8th Cir. 2004) ................................................................ 33

*Rawa v. Monsanto Co.*,
   934 F.3d 862 (8th Cir. 2019) ................................................................ 26

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
   944 F.3d 1035 (9th Cir. 2019) ................................................................ 28, 44

*Saucillo v. Peck*,
   25 F.4th 1118 (9th Cir. 2022) ................................................................ 28

*Thompson v. Edward D. Jones & Co.*,
   992 F.2d 187 (8th Cir. 1993) ................................................................ *passim*

*Trombley v. Nat'l City Bank*,
   826 F. Supp. 2d 179 (D.D.C. 2011) ................................................................ 51

*United States v. Hataway*,
   933 F.3d 940 (8th Cir. 2019) ................................................................ 35

*Wal-Mart Stores, Inc. v. Visa USA, Inc.*,
  396 F.3d 96 (2d Cir. 2005) ....................................................................................*passim*

**State Cases**

*Alack v. Vic Tanny Int'l of Mo., Inc.*,
  923 S.W.2d 330 (Mo. 1996) ................................................................. 33

*Brown v. Smith*,
  601 S.W.3d 554 (Mo. Ct. App. 2020) ................................................ 30, 32

*Emerald Pointe, LLC v. Jonak*,
  202 S.W.3d 652 (Mo. Ct. App. 2006) ...................................................... 32

*Rathbun v. CATO Corp.*,
  93 S.W.3d 771 (Mo. Ct. App. 2002) ....................................................... 33

*Royal Banks of Mo. v. Fridkin*,
  819 S.W.2d 359 (Mo. 1991) .................................................................. 33

*Wilson v. Gen. Mortg. Co.*,
  638 S.W.2d 821 (Mo. Ct. App. 1982) ....................................................... 31

**Rules**

Fed. R. Civ. P. 23 ...........................................................................48, 52

Fed. R. Civ. P. 23(a) ............................................................................ 14

Fed. R. Civ. P. 23(b)(3) ........................................................................ 14

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................48, 49

Fed. R. Civ. P. 23(e) ............................................................................ 26

Fed. R. Civ. P. 23(e)(2) ...................................................................*passim*

Fed. R. Civ. P. 23(e)(2)(C)(ii).................................................................. 51

Fed. R. Civ. P. 23(e)(2)(C)(ii).................................................................. 52

Fed. R. Civ. P. 23(e)(2)(D)..................................................................... 45

# STATEMENT OF ISSUES

All issues on this appeal arise out of the district court's order finding the settlements to be "fair, reasonable, and adequate" under Fed. R. Civ. P. 23(e)(2).

**1. Legal Standard.** In determining whether the settlements were fair, reasonable, and adequate, did the district court correctly consider the factors not only in Rule 23(e)(2) but also in this Court's precedent?

- *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999)

- *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070 (11th Cir. 2023)

**2. Settlement Release.** Did the district court correctly hold that class members who both sold and bought homes could release all their claims arising out of the same alleged antitrust conspiracy in exchange for settlement benefits, and that they in fact did so?

- *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800 (8th Cir. 2004)

- *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999)

- *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187 (8th Cir. 1993)

**3. Equitable Treatment.** Did the district court correctly hold that the settlements treat class members equitably and establish a plan for class counsel to propose and class members to comment on a plan for allocating the settlement fund among themselves after all settlements have been approved?

- *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999)

- *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987)

**4. Cheatham and Spring Way Center.** Did the district court correctly reject underdeveloped objections brought by class members represented by counsel who filed copycat lawsuits after these settlements were reached?

- *In re Prudential Ins. Co. Am. Sales Pracs. Litig.*, 148 F.3d 283 (3d Cir. 1998)

## STATEMENT OF THE CASE

These appeals arise out of the district court's approval of the first three class action settlements reached in this long-running antitrust litigation involving the residential real estate industry. Many more settlements have followed. The relevant background is as follows.[1]

### A. Plaintiffs allege and litigate a nationwide antitrust conspiracy to inflate prices paid to real estate agents and brokers.

In 2019, two sets of plaintiffs filed putative class actions alleging antitrust violations. The case on appeal was filed in the Western District of Missouri. *See Burnett, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 4:19-cv-332-SRB (W.D. Mo.). Plaintiffs alleged that the National Association of Realtors (NAR), the trade organization representing real estate agents, conspired with the country's four largest real estate companies in violation of federal antitrust law and Missouri law to inflate

---

[1] "__.App." means appellants' appendices. "__.Add." means appellants' addenda. The appellant is denoted at the start of the citation (*e.g.*, "Mullis.Add." means Mullis's Addendum). "R.Doc." citations refer to the ECF page number unless noted.

commissions paid to brokers in connection with residential home sales. (Mullis.App.195-96; R.Doc.759 at 1-2.) The named defendants were NAR, Anywhere Real Estate Inc. (Anywhere),[2] RE/MAX, LLC (RE/MAX), Keller Williams Realty, Inc. (Keller Williams), and HomeServices of America, Inc. and its subsidiaries and affiliates. (Mullis.App.196-97; R.Doc.759 at 2-3.)

The "cornerstone of [the] conspiracy" was NAR's alleged requirement that all brokers representing home sellers make a "blanket, unilateral and effectively non-negotiable offer of buyer broker compensation" when listing properties on Multiple Listing Services (MLSs). (Mullis.App.197; R.Doc.759 at 3.) Plaintiffs claimed that this requirement inflated the amounts of the buyer broker commissions that home sellers paid. (Mullis.App.197-98; R.Doc.759 at 3-4.) MLSs are databases that compile listings of properties for sale in a particular region. (*Id.*) Most MLSs nationwide are controlled by NAR, and even those not directly controlled are affected by NAR's policies through ethics rules that agent and broker members commit to follow. (*Id.*) Plaintiffs brought their suit on behalf of all people who listed properties on any of four Missouri MLSs. (Mullis.App.237; R.Doc.759 at 43.)

Another case raising federal antitrust claims against the same defendants based on the same antitrust conspiracy was filed in the Northern District of Illinois. *See Moehrl v. Nat'l Ass'n of Realtors et al.*, No. 1:19-cv-1610 (N.D. Ill.). This case included

---

[2] Anywhere was formerly known as "Realogy Holdings Corp" and was named as such in Plaintiffs' Complaint. (Mullis.App.195; R.Doc.759 at 1.)

MLSs in Delaware, Maryland, Washington D.C., New Jersey, Pennsylvania, Virginia, West Virginia, North Carolina, South Carolina, Florida, Wisconsin, Ohio, Minnesota, Utah, Colorado, Nevada, Texas, Arizona, and Michigan. *See generally Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023).

In 2020, a third case alleging federal and state antitrust claims was filed in the District of Massachusetts. *See Nosalek v. MLS Prop. Info. Network, Inc. et al.*, No. 1:20-cv-12244-PBS (D. Mass.). The same four non-NAR defendants were named, and the MLS Property Information Network, Inc. ("MLS PIN"), an MLS not controlled by NAR, was named in place of NAR. MLS PIN covered parts of Massachusetts, New Hampshire, Connecticut, Rhode Island, Maine, Vermont, and New York. *See Nosalek v. MLS Prop. Info. Network, Inc.*, 575 F. Supp. 3d 199, 201 (D. Mass. 2021).

Finally, in 2021, a fourth case was filed in the Northern District of Illinois. *See Batton, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 1:21-cv-430 (N.D. Ill.). The defendants were the same as those named in the prior complaint filed in the Northern District, and the alleged conspiracy was also the same, but these plaintiffs asserted they had been injured when they *bought* homes because the allegedly inflated broker commissions paid by home sellers supposedly increased home prices. (*See* Mullis Mot. to Supplement Record, Ex. 2 at 1-6.) Because the home buyer plaintiffs did not themselves purchase the broker services, the court ruled they were only permitted to assert indirect-purchaser claims under state law. *See Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 311 (N.D. Ill. 2022); *Batton v. Nat'l Ass'n of Realtors*, 2024 WL 689989,

at *2 (N.D. Ill. Feb. 20, 2024). Objector Mullis is a named plaintiff in *Batton* and is represented by the same counsel in connection with his objection. (Mullis.Br.8.)

The *Burnett* case set the quickest pace. From 2019 through 2023, the parties completed extensive fact and expert discovery in which they subpoenaed numerous third parties, took 80 depositions, and served dozens of expert reports. (Mullis.App.475-76; R.Doc.1458-2 ¶¶ 12-13.) They also engaged in extensive motions practice, including motions to dismiss, for summary judgment, to compel arbitration, and for class certification. (*Id.* ¶¶ 12, 14.) In April 2022, the district court certified classes of people who sold homes on the four Subject MLSs. *See Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 1203100, at *20 (W.D. Mo. Apr. 22, 2022). (In March 2023, the district court in *Moehrl* certified an even broader class of people who sold homes. *See Moehrl*, 2023 WL 2683199, at *3-4, *24-25.) The *Burnett* case was set for trial on October 16, 2023. (Mullis.App.137; R.Doc.1020.)

**B.    Plaintiffs reach an icebreaker settlement with Anywhere shortly before trial, and settlement with RE/MAX quickly follows.**

Several times over five years of litigation, the parties tried without success to reach agreement on settlement. They engaged multiple mediators, attended formal mediations, and held informal settlement calls and meetings, all without success. (Mullis.App.476-77; R.Doc.1458-2 ¶ 18.)

In August 2023, as the October trial in *Burnett* approached, Anywhere and counsel for the *Burnett* and *Moehrl* Plaintiffs engaged in a separate mediation.

(SpringWay.App.1299-1300; R.Doc.1478 at 11-12.) Both sides faced imminent risk at trial. Anywhere faced the risk of bankruptcy-level damages from Plaintiffs' claim for approximately $1.8 billion, before trebling. (SpringWay.App.1312-14; R.Doc.1478 at 24-26.) Plaintiffs faced the risk of a complete loss after five years of litigation, and Anywhere had particularly problematic factual defenses to the NAR-based conspiracy Plaintiffs alleged. Anywhere was not an NAR member, did not require its franchisees to adhere to NAR rules, and was outspoken in *opposing* the very "mandatory offer" NAR rule that served as the "cornerstone" of Plaintiffs' case. (SpringWay.App.1306-10; R.Doc.1478 at 18-22.) Indeed, Anywhere had formally petitioned NAR to rescind the mandatory-offer rule. (SpringWay.App.1307; R.Doc.1478 at 19.)

To settle, Plaintiffs demanded sweeping practice changes and maximum monetary value. Anywhere, for its part, needed global peace. Given the other pending suits, resolving one part of the country while leaving annihilating risk outstanding elsewhere would be pointless. Likewise, given that many people both sold and bought homes, often in tandem, and that antitrust claims had been asserted for both selling and buying, Anywhere refused to settle only some of the class members' antitrust claims—their claims as home sellers—and leave the same people free to sue Anywhere again in their role as home buyers based on the same alleged conspiracy. (SpringWay.App.1316-21; R.Doc.1478 at 28-33.)

After "extensive and hard-fought settlement negotiations" (Cheatham.App.233; R.Doc.1469 at 14), Plaintiffs and Anywhere reached agreement on a nationwide class

action settlement resolving all claims by class members arising out of the alleged conspiracy. It was the first settlement of the litigation—the so-called icebreaker. The district court was notified on September 5, 2023, and Anywhere withdrew its trial witnesses. (Mullis.App.145, 148; R.Doc.1107; R.Doc.1130.)

As Anywhere needed, the settlement class was nationwide. It included all persons who sold a home on any MLS within the United States where a commission was paid to any brokerage in connection with the sale of that home. (Mullis.App.257; R.Doc.1192-3 ¶ 18.) As such, it included the MLSs in *Burnett*, *Moehrl*, *Nosalek*, and all other MLSs around the country. The total class size is approximately 30 million members. (Cheatham.App.322; R.Doc.1469-3 ¶ 53.)

Also as Anywhere needed, the settlement released *all* claims class members had against Anywhere arising out of the alleged conspiracy to inflate real estate commissions, whether for inflated commissions paid directly when they sold homes or indirectly (through allegedly inflated home prices) when those same people bought homes. The release covered "any and all manner of claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home." (Mullis.App.255; R.Doc.1192-3 ¶ 14.) By agreement, the release did "not extend to any individual claims that a class member may have against his or her own broker or

agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, *other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions*." (Mullis.App.262; R.Doc.1192-3 ¶ 32 (emphasis added).)

In exchange for this release, all class members received substantial benefits. Anywhere, as the first brokerage and franchisor to settle, agreed to make sweeping changes in how it approached brokerage commissions, including by imposing new disclosure, training, and MLS listing requirements. (*See* Mullis.App.268-70; R.Doc.1192-3 ¶ 51 (detailing practice changes).) Anywhere also agreed to pay $83.5 million into a common settlement fund. (Mullis.App.257-58; R.Doc.1192-3 ¶ 21.) None of that money will revert to Anywhere (Mullis.App.265; R.Doc.1192-3 ¶ 40), and Anywhere specifically disclaimed any voice in how settlement funds are distributed among class members (*id.* ¶ 42). The settlement does not sort class members into subcategories or in any way treat some class members differently from any others. (Cheatham.App.246; R.Doc.1469 at 27.) The practice changes apply universally, and every class member is eligible to receive a cash payment.

Because the parties (correctly) anticipated that further settlements would be reached with other defendants providing more money to the same class members, Plaintiffs deferred setting a plan for how the $83.5 million would be allocated among class members. Anywhere has "no participatory or approval rights with respect to the Plan of Allocation." (Mullis.App.265; R.Doc.1192-3 ¶ 42.) The "Plan of Allocation"

will be "proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court." (*Id.*) And the settlement is enforceable *regardless* of how the money is ultimately allocated: "[A]ny modification or rejection of the Plan of Allocation *shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement*." (*Id.* (emphasis added).) Hence, the settlement could be approved as to Anywhere, with allocation among class members to be addressed later.

Shortly after Plaintiffs reached agreement with Anywhere, they settled with RE/MAX. On September 18, 2023, Plaintiffs notified the district court. (Mullis.App.149; R.Doc.1138.) Like Anywhere, RE/MAX had strong defenses. RE/MAX's decision to require its franchisees to comply with NAR ethics rules had been made decades before the start of the alleged conspiracy and, indeed, decades before the at-issue NAR rules came into existence. (SpringWay.App.1279-80; R.Doc.1473 at 4-5.) RE/MAX was not an NAR member, and RE/MAX's key executives testified that they had not even heard of the relevant NAR rules until after this litigation was filed and, thus, could not have implemented the rules because of a conspiracy. (*Id.*) This strongly suggested that RE/MAX required its franchisees to comply with NAR ethics rules, not as part of a conspiracy to inflate broker commissions, but for "independent business" reasons. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037 (8th Cir. 2000) (en banc) ("where

there is an independent business justification for the defendant's behavior, no inference of conspiracy can be drawn").

The form of RE/MAX's settlement followed Anywhere's template. (*Compare* Mullis.App.285-319; R.Doc.1192-4 *with* Mullis.App.250-84; R.Doc.1192-3.) RE/MAX agreed to settle for $55 million, using the same non-reversionary common fund and deferred plan of allocation. (Mullis.App.293, 300-01; R.Doc.1192-4 ¶¶ 21, 40, 42.) The RE/MAX agreement applied to the same settlement class and included many of the same franchisor practice changes. (Mullis.App.292, 303-06; R.Doc.1192-4 ¶¶ 18, 51.) And it included the same broad release of all claims arising out of the alleged conspiracy. (Mullis.App.290, 297-98; R.Doc.1192-4 ¶¶ 14, 32.)

## C. The case proceeds to trial without Anywhere and RE/MAX, and Plaintiffs prevail against the remaining defendants.

After Anywhere and RE/MAX settled, the *Burnett* trial proceeded against the remaining defendants. On October 31, 2023, Plaintiffs won a jury verdict awarding pre-trebled damages of $1,785,310,872, representing 100% of buyer broker fees. (SpringWay.App.497; R.Doc.1294 at 2.) The verdict received extensive press coverage and prompted numerous copycat suits, including the Cheatham and Spring Way Center objectors' suits. *See Burton v. Nat'l Ass'n of Realtors, et al.*, No. 7:23-cv-5666-JDA (D.S.C.) (filed Nov. 6, 2023) (Cheatham); *Spring Way Ctr., LLC, et al. v. W. Penn Multi-List, Inc., et al.*, No. 2:23-cv-2061-WSS (W.D. Pa.) (filed Dec. 4, 2023) (Spring Way).

**D.    The district court grants preliminary approval of the Anywhere and RE/MAX settlements, plus a post-trial Keller Williams settlement, and authorizes notice to be sent.**

Three weeks after trial ended, on November 20, 2023, the district court granted preliminary approval of the Anywhere and RE/MAX settlements. (SpringWay.App.599-606; R.Doc.1321.) The court found that the settlements were "reasonable and adequate" and that "the class representatives have adequately represented the class." (SpringWay.App.599-600; R.Doc.1321 at 1-2.) The court further found that there "ha[d] been adequate opportunity for discovery for experienced counsel to evaluate the claims and risks at this stage of litigation" and the court would "likely be able to approve the [agreements] pursuant to Rule 23(e)(2)." (SpringWay.App.600; R.Doc.1321 at 2.) The court addressed the nationwide scope of the settlement classes and found it was warranted because "plaintiffs have conducted extensive discovery into the alleged nationwide conspiracy" and "a nationwide settlement was a necessary condition of obtaining any settlement for the benefit of the class." (SpringWay.App.602-03; R.Doc.1321 at 4-5.) The court appointed JND Legal Administration (JND) as the settlement administrator and authorized the notice, claims, opt-out, and objection processes. (*Id.*)

Before those processes began for the Anywhere and RE/MAX settlements, a third settlement was reached with Keller Williams for $70 million. (SpringWay.App.607-10; R.Doc.1371.) The settlement again followed Anywhere's template. (*Compare* Mullis.App.320-53; R.Doc.1371-1 *with* Mullis.App.250-84;

R.Doc.1192-3.) Because it followed that same template, the district court granted it preliminary approval. (SpringWay.App.611-18; R.Doc.1372.)

Notice was sent in tandem for the Anywhere, RE/MAX, and Keller Williams settlements, saving substantial resources. Settlement class members had until April 13, 2024 to opt out or object to the settlement. (Mullis.App.357; R.Doc.1371-4 at 4.) The first page of the class notice informed settlement class members that the settlement was nationwide—it included all people who listed homes on any MLS in the United States. (Cheatham.App.380; R.Doc.1469-3 at 71.) The notice further informed settlement class members of the benefits they might receive, how to submit a claim, and how to opt out of or object to the settlement. (Cheatham.App.384-88; R.Doc.1469-3 at 75-79.) Finally, it informed class members they were releasing all claims that they "paid an excessive commission or home price due to the claims at issue" in the actions. (Cheatham.App.385; R.Doc.1469-3 at 76.)

### E. Nearly 200,000 class members submit claims, only 12 object, and the district court grants final approval.

In response to the class notice, 194,733 class members submitted claims by the time of the final fairness hearing on May 9, 2024. (Cheatham.App.322; R.Doc.1469-3 ¶ 49.) The claims period remains open until May 9, 2025, and claims continue to be filed. (*Id.* ¶ 50.) Only 61 class members chose to opt out of the settlement, and only 12 filed objections. (*Id.* ¶¶ 52-53.) Among the twelve objectors were the three

appellants here: James Mullis, Spring Way Center LLC[3] ("Spring Way"), and Benny Cheatham[4] (together, the "Objectors"). (*See* Cheatham.App.102-15; R.Doc.1441; Mullis.App.405-18; R.Doc.1447; SpringWay.App.856-65; R.Doc.1448.) As noted above, all three have their own competing lawsuits.

On May 2, 2024, Plaintiffs moved for final approval of the settlements with Anywhere, RE/MAX, and Keller Williams. (Cheatham.App.220-94; R.Doc.1469.) The motion specifically addressed each of the Rule 23(e)(2) factors (Cheatham.App.245-47; R.Doc.1469 at 26-28), in addition to responding to each of the objections (Cheatham.App.247-93; R.Doc.1469 at 28-74). The district court held a hearing on final approval a week later. Representatives for Plaintiffs, Anywhere, RE/MAX, Keller Williams, Mullis, Spring Way, and Cheatham all attended. (SpringWay.App.1377-1413; R.Doc.1492.) The court heard argument from Mullis, Spring Way, and Cheatham. (*See* SpringWay.App.1386-91; R.Doc.1492 at 10-15) (Cheatham); SpringWayApp.1391-1396; R.Doc.1492 at 15-20 (Spring Way); SpringWay.App.1396-1402; R.Doc.1492 at 20-26 (Mullis).)

After hearing the Objectors' arguments, the district court overruled them and approved the settlements. In a thorough, 40-page opinion, the district court addressed

---

[3] Spring Way's objection was joined by Nancy Wehrheim.
[4] Cheatham's objection was joined by Robert Douglass, Douglas Fender, and Dena Fender.

each of the requirements for certifying a class and approving a settlement and found them all met.

**Class notice.** First, the court determined that the notice process had been "extremely successful" in reaching class members, resulting in nearly 200,000 claims being made as of May 2024 with more to come. (Mullis.App.503-04; R.Doc.1487 at 2-3; Mullis.Add.2-3.) The court found that the notice "fully and accurately informed members of the Settlement Class of all material elements of the Settlements." (*Id.*)

**Class certification.** Second, the district court determined that certifying the settlement classes was appropriate under Federal Rule of Civil Procedure 23(a) and (b)(3). (Mullis.App.505-07; R.Doc.1487 at 4-6; Mullis.Add.4-6.) The court "specifically considered that the settlement class is broader than the class alleged in the complaint." (*Id.*) On this point, the court expressly found that "[t]he record supports the view that the Settling Defendants would not have settled on anything less than a nationwide basis, because doing so would have left them exposed to potentially crippling liability . . . [E]nforcement of the *Burnett* verdict alone would have bankrupted the Settling Defendants." (Mullis.App.521; R.Doc.1487 at 20; Mullis.Add.20.) A nationwide class was therefore required and appropriate. As the court explained, courts "regularly certify broader settlement classes than litigation classes," and here Plaintiffs had conducted "extensive discovery into the alleged nationwide conspiracy." (Mullis.App.507; R.Doc.1487 at 6; Mullis.Add.6.)

**Fairness, reasonableness, and adequacy.** Third, the district court held that, "[u]nder Federal Rule of Civil Procedure 23(e)(2) . . . the Settlements with Anywhere, RE/MAX, and Keller Williams, as set forth in the Settlement Agreements, are fair, reasonable, and adequate." (Mullis.App.509; R.Doc.1487 at 8; Mullis.Add.8.) The court expressly found that "[t]he Class Representatives have adequately represented the class," that "settlement proceeds will be distributed equitably and reduced on a pro rata basis," and that this was not a settlement with "different groups of plaintiffs with non-overlapping claims that might conflict." (Mullis.App.509, 518, 530; R.Doc.1487 at 8, 17, 29; Mullis.Add.8, 17, 29.)

The district court also addressed at length the benefits the settlements provided to class members and found them to be fair, reasonable, and adequate. The three settlements collectively provided $208.5 million for class members, which was "substantial." (Mullis.App.509-12; R.Doc.1487 at 8-11; Mullis.Add.8-11.) In addition, the Anywhere and RE/MAX Settlements were icebreakers that cleared the way for others. (*Id.*) As of the fairness hearing, six other settlements had been preliminarily approved that brought the "total settlement fund" to "over $600 million," and other settlements had been announced "bringing the total to over $900 million." (*Id.*) The settlement amounts were all the more reasonable in light of "the financial condition of the Settling Defendants." (*Id.*) Plaintiffs had used a forensic accountant "to confirm each defendant's ability to pay while still maintaining a viable business." (*Id.*) The court found that "[t]he Settlements each capture a significant portion of the Settling

Defendants' available assets while still allowing them to continue operations." (*Id.*) "In contrast, the joint and several liability that would have resulted from a judgment would have been disastrous for any of the defendants." (*Id.*) Additional factors supporting the reasonableness of the settlement amounts were "the risks that the Settlement Class would have faced in continuing to litigate against Anywhere, RE/MAX, and Keller Williams and the cost and complexity of continued litigation," particularly given the complexity of defenses associated with antitrust litigation. (*Id.*) The settlements were further "supported by the substantial benefits to the class afforded by the practice changes obtained by the Settlements." (*Id.*)

**Objections.** Finally, the Court carefully considered the 12 submitted objections and held that none identified a reason for denying approval.

One objector argued that the settlements were deficient because they had not yet addressed how funds would be allocated among class members. The court overruled this objection because "courts repeatedly hold that parties do not need to include a detailed allocation formula in class notice or formulate one before final settlement approval." (Mullis.App.516-17; R.Doc.1487 at 15-16; Mullis.Add.15-16.) An allocation plan could be deferred, the court explained, "because court approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation." (*Id.*) The court can determine that the total "amount paid is commensurate with the value of the case . . . before a distribution scheme has been adopted so long as the distribution scheme does not affect the

obligations of the defendants under the settlement agreement." (*Id.*) It was also wise, and even necessary, to "defer creation of an allocation plan, when, as here, there are multiple defendants, only some have settled, and additional settlements may add to the fund to be distributed." (*Id.*)

Considering these factors, the district court ordered that, before funds were distributed to class members, Plaintiffs' counsel would be required "to prepare and submit for Court approval a plan of allocation for the Settlement Fund, and to propose a schedule for comment and Court review." (Mullis.App.539-40; R.Doc.1487 at 38-39; Mullis.Add.38-39.) The "proposed plan" would be posted on the settlement website and "emailed to all individuals who submit a claim in order to provide those individuals an opportunity to comment on the plan." (*Id.*) "After the plan of allocation is proposed and an opportunity to comment has been provided," the court would decide whether to approve the plan. (*Id.*)

With respect to the three objections at issue on this appeal, the court noted they "were lodged by counsel for plaintiffs in other cases alleging the same or similar [facts] as those in *Moehrl* and *Burnett*," each of those cases was in its "infancy," none had "a certified class," and each had been "filed after and . . . derived from *Moehrl* and *Burnett*." (Mullis.App.519; R.Doc.1487 at 18; Mullis.Add.18.) "[N]one . . . advances the best interest of the class members who stand to gain monetary and practice change relief from the Settlements." (*Id.*)

The objections filed by **Cheatham** and **Spring Way** were largely duplicative: Cheatham filed first, and Spring Way largely copied Cheatham's arguments. (Cheatham.App.102-15; R.Doc.1441; SpringWay.App.856-65; R.Doc.1448.) The district court overruled the objections. Regarding the nationwide scope of the settlement classes, the court noted that, "[o]ften, broad classes are a practical prerequisite to reaching any settlement because a defendant will not agree to any meaningful settlement unless it can obtain global peace." (Mullis.App.520-21; R.Doc.1487 at 19-20; Mullis.Add.19-20.) "Conversely, because global peace is most valuable to defendants, defendants will pay more to obtain it, thus benefitting class members." (*Id.*) The court found that "these considerations apply here." (*Id.*) The court found that "[t]he record supports the view that the Settling Defendants would not have settled on anything less than a nationwide basis, because doing so would have left them exposed to potentially crippling liability." (*Id.*) Indeed, "Settlement was not possible on a piecemeal basis, and enforcement of the *Burnett* verdict alone would have bankrupted the Settling Defendants." (*Id.*) In addition, "Plaintiffs here were well positioned to adequately represent a nationwide settlement class because they alleged a nationwide conspiracy." (*Id.*) Finally, "[o]nly a small number of MLSs are not exclusively owned or operated by NAR associations, and even those MLSs are not fully independent of NAR." (*Id.*) So a nationwide settlement was appropriate.

Regarding the amount of the settlement, the Court found objectors' arguments on inadequacy "unsubstantiated." (Mullis.App.523-24; R.Doc.1487 at 22-23;

Mullis.Add.22-23.) "Class Counsel made clear in their filing and declarations that they analyzed the finances of Settling Defendants and determined this was the most they could reasonably pay." (*Id.*) "Obtaining relief now, rather than risk bankruptcy or reversal on appeal, was the most prudent thing Class Counsel could have done." (*Id.*) In sum, "[t]he Court overrules objections that the Settlement amounts paid are too low. The Court has presided over the *Burnett* litigation for five years and is in a superior position to evaluate this objection." (Mullis.App.515; R.Doc.1487 at 14; Mullis.Add.14.)

Regarding the release of franchisees, the Court found that because class settlements commonly release affiliates and franchisees from liability, it was not "unfair or inappropriate" to do so here too. (Mullis.App.525-26; R.Doc.1487 at 24-25; Mullis.Add.24-25.)

Finally, the practice changes that endured for five years were entirely sufficient. (*Id.*) "No company," the court held, "wishes to stay under the enforcement power of a court indefinitely, nor does a court wish to retain such indefinite jurisdiction." (*Id.*)

**James Mullis** primarily objected to the settlements on the basis that they released all claims class members had arising out of the alleged conspiracy to increase the prices of broker commissions—including claims that members had as both home sellers and home buyers. (Mullis.App.405-18; R.Doc.1447.) (Mullis also sought a temporary restraining order against the final approval proceedings, a request that was

immediately denied. *Batton, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 1:21-cv-430, Dkt. 154 (N.D. Ill.).)

The court rejected Mullis's objection. At the outset, the court found that "[t]he record in this case shows that a nationwide settlement class and release of all potential claims arising out of the same alleged antitrust conspiracy was necessary to enable the settlements to occur." (Mullis.App.527-29; R.Doc.1487 at 26-28; Mullis.Add.26-28.) In addition, "[r]eleases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the Settling Defendant arising out of the same conspiracy, including indirect-purchaser claims." (*Id.*) Here, the claims of class members who both sold and bought homes "indisputably arise out of the same alleged conspiracy and the same factual predicates." (*Id.*) The argument that they "could not release all of their claims arising out of the same alleged conspiracy is therefore overruled." (*Id.*)

The court further found Mullis's complaints that the named Plaintiffs were inadequate to represent people who both bought and sold homes were unfounded. Nine named Plaintiffs both bought and sold homes within the class period. (Mullis.App.530; R.Doc.1487 at 29; Mullis.Add.29.) All class members' interests were aligned in seeking the maximum total recovery. (Mullis.App.515; R.Doc.1487 at 14; Mullis.Add.14.) And finally, class members who wanted to opt out could do so. (Mullis.App.530; R.Doc.1487 at 29; Mullis.Add.29.)

Ultimately, the court granted final approval of the settlements, overruled the objections, entered judgment on the claims against Anywhere, RE/MAX, and Keller Williams, and found no just reason for delay in making that judgment final. (Mullis.App.540; R.Doc.1487 at 39; Mullis.Add.39.)

Cheatham, Spring Way, and Mullis filed timely notices of appeal. (*See* Mullis.App.191-92; R.Doc.1498; R.Doc.1506; R.Doc.1511.) This Court ordered each appellee to file a consolidated brief addressing all appeals at once.

## SUMMARY OF ARGUMENT

The settlements with Anywhere and RE/MAX broke the ice in this long-running antitrust litigation and established a template for more than a dozen subsequent settlements that have collectively recovered $1 billion for class members and are transforming the residential real estate industry. The district court acted well within its discretion in approving the Anywhere and RE/MAX settlements as fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e)(2).

Most of the district court's findings are unchallenged on appeal. The settlements were negotiated at arms-length after extensive litigation and at the point of maximum uncertainty and risk to both sides before trial. Plaintiffs, rather than risk losing or at best having unsecured claims in bankruptcy, secured in settlement a substantial portion of each Defendant's available cash, allowing them to continue operations. The notice and claims process were exceedingly effective.

The only class members still objecting are three people spurred on by the self-interest in preserving their own competing cases, but the district court properly rejected their objections. Mullis is wrong in asserting that the district court applied the incorrect legal standard. The court applied the correct standards and properly evaluated each of the Rule 23(e)(2) factors. Mullis is also wrong to challenge the release for providing that class members who both sold and bought homes (often in immediate succession) released their antitrust claims arising out of both their sales and their purchases. Defendants required settling class members to release all the claims they personally held arising from the same alleged conspiracy. Plaintiffs agreed in exchange for the expansive settlement benefits. Mullis provides no basis for overriding the parties' agreement. Plaintiffs are allowed to release all their claims arising out of the same factual predicate, and here all released claims flow from the same alleged conspiracy to inflate the price of real estate broker commissions. And any class member who disagreed with the scope of the release could have opted out of the settlement entirely.

To the extent the objection speaks to how settlement funds will be allocated among class members, Anywhere and RE/MAX have no interest in that issue, and any objection is premature because the district court properly directed Plaintiffs to propose an allocation plan for review and comment after all related settlements are approved.

Finally, the scattershot objections from Cheatham and Spring Way should be rejected. A nationwide resolution was a prerequisite for any settlement, as was a release of all entities affiliated with Anywhere and RE/MAX. The monetary amounts were properly negotiated based on the risks to both sides at the time of settlement. The parties had no obligation to account for a jury verdict that had not yet occurred and that, when it did occur, involved only other defendants. The sweeping practice changes apply to all released parties. And the required notice was provided to all class members. Final approval should be affirmed.

## STANDARD OF REVIEW

A district court may approve a class settlement if it is "fair, reasonable, and adequate" under the factors set forth in Rule 23(e)(2) and Eighth Circuit case law. *See In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 977-78 (8th Cir. 2018). "Great weight is accorded" to the views of the district court reviewing a class settlement because it is "exposed to the litigants, and their strategies, positions, and proofs," and "is aware of the expense and possible legal bars to success." *Marshall v. NFL*, 787 F.3d 502, 508 (8th Cir. 2015). This Court accordingly reviews subsidiary findings of fact within a settlement approval order only for clear error, *see Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1147, 1150-51 (8th Cir. 1999), and it will "set aside" the district court's ultimate approval conclusion "only upon a clear showing that the district court abused its discretion." *Pollard v. Remington Arms Co., LLC*, 896 F.3d 900, 907 (8th Cir. 2018).

# ARGUMENT

## I.  The District Court Acted Well Within Its Discretion In Approving The Anywhere And RE/MAX Settlements.

The district court, which presided over five years of litigation and a full jury trial, evaluated the Anywhere and RE/MAX settlements closely and found them to be fair, reasonable, and adequate under Rule 23(e)(2). This Court should affirm the district court's reasoned judgment.

Most of the district court's findings supporting approval of the Anywhere and RE/MAX settlements are unchallenged on appeal. The settlements were reached after "years of extensive discovery," *Petrovic*, 200 F.3d at 1146, and "on the brink of trial," *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 102-04, 117-19 (2d Cir. 2005), when Plaintiffs had maximum knowledge and faced maximum risk and uncertainty. They were the first settlements Plaintiffs secured in five years of litigation and were particularly "advantageous to the class" because they "broke the ice and brought other defendants to the point of serious negotiations"—converting previously risky and uncertain claims into concrete settlement terms that other defendants could copy. *In re Corrugated Container Antitrust Litig.*, 1981 WL 2093, at *19 (S.D. Tex. June 4, 1981). After the Anywhere and RE/MAX settlements broke the ice, a flood of settlements has followed that, to date, total $1 billion. (SpringWay.App.1300-01; R.Doc.1478 at 12-13.)

The settlement amounts received from Anywhere and RE/MAX alone were substantial. Anywhere's non-reversionary common fund of $83.5 million, and RE/MAX's non-reversionary common fund of $55 million, were approximately *half* of both companies' cash reserves at the time and had been carefully evaluated by Plaintiffs' accountant, who determined that Anywhere and RE/MAX could not pay more without jeopardizing their ability to continue as ongoing concerns. (Cheatham.App.307-08; R.Doc.1469-2 ¶¶ 12-19; *accord* SpringWay.App.1312-14; R.Doc.1478 at 24-26; SpringWay.App.1281; R.Doc.1473 at 6.) As the district court found, the settlements thus "capture[d] a significant portion of the Settling Defendants' available assets while still allowing them to continue operations." (Mullis.App.510; R.Doc.1487 at 9; Mullis.Add.9.) *See Grunin v. IHOP*, 513 F.2d 114, 125 (8th Cir. 1975) (affirming antitrust class settlement that "gave valuable concessions to" the class while still "maintain[ing] [defendant's] corporate viability"). This finding is reviewed only for clear error or a clear abuse of discretion, and it is neither.

Beyond monetary relief, the settlement obtained sweeping injunctive relief addressing the practices Plaintiffs claimed led to inflated broker commissions. (Mullis.App.512-14; R.Doc.1487 at 11-13; Mullis.Add.11-13.) The district court found that the combined monetary and injunctive relief was "fair, reasonable, and adequate." (*Id.*) This finding was in no way an abuse of discretion either. *Cf., e.g., Target*, 892 F.3d

at 972, 974 n.6, 978 (approving class settlement where substantial "subgroup" of the class received only "injunctive relief").

Given the excellent settlement terms, it is unsurprising that nearly 200,000 people had submitted claims by the time of the final approval hearing, while only 12 objected to the settlements. Of those twelve, only three chose to appeal. Each is represented by counsel in a competing antitrust case. The district court concluded that their interests are in preserving their own lawsuits, not acting on behalf of the broader settlement class in this case. (Mullis.App.519; R.Doc.1487 at 18; Mullis.Add.18.) This conclusion, again, was not an abuse of discretion. *See In re Prudential Ins. Co. Am. Sales Pracs. Litig.*, 148 F.3d 283, 318 (3d Cir. 1998) (courts may properly take note that "the most vociferous objectors to" a class settlement are "litigants represented by counsel in" "compet[ing]" cases); *Greco v. Ginn Dev. Co.*, 635 F. App'x 628, 633 (11th Cir. 2015) (same).

This Court should therefore affirm, because none of the objections provides a basis for finding that the district court abused its discretion in approving the Anywhere and RE/MAX settlements.

### A.     The Mullis objection fails.

Mullis raises one technical argument regarding the standard the district court applied to review the settlements and three related arguments regarding the settlement's release of all of class members' claims arising out of the same alleged conspiracy. None of these arguments proves any error, much less reversible error.

### 1. The district court applied the correct legal standard.

In reviewing the settlements, the district court directly (and correctly) stated the controlling standard:

> The standard for reviewing a proposed settlement of a class action is whether it is 'fair, reasonable, and adequate.' *In re Wireless Tel. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005). Federal Rule of Civil Procedure 23(e)(2) establishes factors the court must consider reviewing a class settlement. Eighth Circuit precedent also sets forth four factors which overlap with the Rule 23(e)(2) factors that a court should review in determining whether to approve a proposed class action settlement . . . .

(Mullis.App.508; R.Doc.1487 at 7; Mullis.Add.7 (citing *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988), among others).) The district court's consideration of both the Rule 23(e)(2) factors and the pre-2018 *Van Horn* factors was entirely correct. The 2018 Amendments to Rule 23(e) were "not intended to 'displace any factor' previously in use." *Cohen v. Brown Univ.*, 16 F.4th 935, 943 n.5 (1st Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendments)). Courts thus continue to cite their pre-2018 factors when evaluating whether a settlement is "fair, reasonable, and adequate." *See, e.g.*, *Rawa v. Monsanto Co.*, 934 F.3d 862, 868 (8th Cir. 2019) (citing *Van Horn*); *see also Moses v. New York Times Co.*, 79 F.4th 235, 239, 246 (2d Cir. 2023) (noting that the application of the "traditional . . . factors" in lieu of "the Rule 23(e)(2) factors" can be "harmless").

Mullis criticizes the district court for stating: "Courts adhere to 'an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval.'"

(Mullis.App.507-08; R.Doc.1487 at 6-7; Mullis.Add.6-7 (quoting 4 Newberg on Class

Action § 11.41); *see* Mullis.Br.24, 26.) There was no error in this statement. The

statement appears in a paragraph repeating the law of this Circuit that "the law

strongly favors settlements. Courts should hospitably receive them." (*Id.* (quoting

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th

Cir. 1990).) In context, the "presumption of fairness" correctly makes the point that

"[a] strong public policy favors [settlement] agreements, and courts should approach

them with a presumption in their favor." *Petrovic*, 200 F.3d at 1148-49. The district

court did not apply an evidentiary presumption or create a heightened burden in

evaluating any aspect of the settlement, and hence it committed no error, as the

Eleventh Circuit recently held when a district court made a similar passing reference

to the "presumption of reasonableness" in reviewing a class settlement. *See In re Blue*

*Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1093 (11th Cir. 2023), *aff'g* 2022 WL

4587618, at *18 (N.D. Ala. Aug. 9, 2022).

Regardless, any error would be harmless. Appellate courts have reversed district

courts for applying a "presumption of fairness" based on "arms-length negotiation"

only when settlement terms indicated potential unfairness, such as "a clear sailing

agreement, [a] disproportionate cash distribution to attorneys' fees, large incentive

payments seemingly untethered from service to the class, [or] reversionary clauses that

would return unclaimed funds to the defendants." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944

F.3d 1035, 1049-50 (9th Cir. 2019); *see, e.g., Moses*, 79 F.4th at 239, 246 (pre-

certification "coupon" settlement and unusually high fees award); *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 776, 782-83 (9th Cir. 2022) (similar and emphasizing that "settlement prior to class certification requires extra scrutiny"); *Saucillo v. Peck*, 25 F.4th 1118, 1131-33 (9th Cir. 2022) (pre-certification settlement where application of the presumption "cast a shadow on the entirety of the district court's order"). No such terms exist here.

> **2.** **The district court correctly held that class members could, and did, release all their claims arising out of the alleged antitrust conspiracy.**

Mullis raises three related arguments arising out of the fact that many people within the class both sold and bought homes—often in quick succession—and the settlements release all claims those people could bring arising out the alleged antitrust conspiracy, whether as sellers or buyers. Mullis argues that the release can apply only to sales and not purchases, leaving class members free to settle with Anywhere and RE/MAX and then promptly sue them again based on the same alleged conspiracy. The district court correctly rejected Mullis's arguments because class members can, and did, release all their claims. Moreover, objections to allocation are premature because a plan of allocation has not yet been proposed or ruled on below, and class members will be given the opportunity to be heard when it is.

### a. Anywhere insisted on a release of all claims, and Plaintiffs agreed in unambiguous language.

Mullis makes the unusual argument that, although Plaintiffs, Anywhere, and RE/MAX all agree that the settlements release all claims arising out of the alleged conspiracy to inflate the prices of real estate broker commissions, the parties did not actually reach that agreement. This argument is baseless.

The release's plain language unambiguously conveys the parties' agreement to release all claims. It covers "any and all manner of claims regardless of the cause of action *arising from or relating to conduct that was alleged or could have been alleged* in the Actions *based on any or all of the same factual predicates* for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home." (Mullis.App.255; R.Doc.1192-3 ¶ 14 (emphases added).) The conduct alleged in the actions was a conspiracy to inflate the commissions paid to real estate brokerages in connection with home sales and purchases. Claims that the inflated commissions caused inflated home prices undoubtedly arise from and relate to that conduct. Hence, claims based on inflated home prices are covered by the release. As the district court correctly noted, "[t]he homebuyer claims by homeseller Class Members indisputably arise out of the same alleged conspiracy and the same factual predicates as the asserted homeseller claims." (Mullis.App.529; R.Doc.1487 at 28; Mullis.Add.28.)

This is unambiguously clear from the quoted language above, but the release goes even further. It expressly categorizes claims that are and are not released, and it includes claims regarding excessive home prices in the released category. The release states that it does "not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, *other than a claim that a class member paid an excessive commission* **or home price** *due to the claims at issue in these Actions*." (Mullis.App.262; R.Doc.1192-3 ¶ 32 (emphasis added).) In other words, the release **does** extend to "a claim that a class member paid an excessive . . . home price due to the claims at issue." No reasonable reading of the release excludes claims asserted by class members arising out of their home purchases.

Releases are contracts, Missouri law controls these contracts (Mullis.Br.47), and in Missouri, as in most states, "[t]he cardinal principle for contract interpretation is to ascertain the intention of the parties" who signed the contract "and to give effect to that intent." *Brown v. Smith*, 601 S.W.3d 554, 560 (Mo. Ct. App. 2020). Here, the parties who negotiated the contracts—Plaintiffs, Anywhere, and RE/MAX—all told the district court (and are telling this Court) that they intended to release all claims arising out of the alleged antitrust conspiracy, including claims based on both home sales and home purchases. Indeed, Anywhere specifically refused to settle only some of Plaintiffs' and class members' antitrust claims: It refused to pay people for their claims arising out of their home sales, only to have the same people sue Anywhere

again for their home purchases based on the same alleged conspiracy. Anywhere insisted on finality with the people it settled with. (SpringWay.App.1316-21; R.Doc.1478 at 28-33.) Plaintiffs agreed and told the district court they agreed. (Cheatham.App.288-89; R.Doc.1469 at 69-70.) RE/MAX then settled with the same release, followed by many others.

The Court should enforce the parties' intent expressed in their negotiated release. The release's plain language "clearly and unambiguously" states that it covers all claims, and that language is controlling. *Wilson v. Gen. Mortg. Co.*, 638 S.W.2d 821, 823 (Mo. Ct. App. 1982); *see also In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 803-05 (8th Cir. 2004) ("no difficulty in concluding" that similarly "broad" release "clearly encompassed" "all" related claims); *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 190-91 (8th Cir. 1993) (same).

Mullis argues on appeal that the release is ambiguous, that extrinsic evidence is therefore admissible to interpret it, and that the evidence supposedly shows the parties did not intend to release all claims. This argument fails for several reasons.

First, Mullis did not argue below that extrinsic evidence should be considered. He therefore forfeited the argument. *See N. Bottling Co. v. PepsiCo*, 5 F.4th 917, 922-23 (8th Cir. 2021).

Second, extrinsic evidence cannot be used "to create an ambiguity that otherwise does not exist"; it can only be used if the contract on its four corners is

ambiguous. *Emerald Pointe, LLC v. Jonak*, 202 S.W.3d 652, 659 (Mo. Ct. App. 2006). And here, the release is not ambiguous so extrinsic evidence is irrelevant.

Mullis attempts to find ambiguity in the language referring to "conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates," arguing that this language incorporates by reference an "identical factual predicate" doctrine. (Mullis.Br.48-50.) No, it does not. The quoted language does not say the release is limited to claims that rest on "*all* of the same factual predicates." Instead, it extends the release to claims that rest on "*any or all* of the same factual predicates." (Mullis.App.255; R.Doc.1192-3 ¶ 14.) Claims that home prices were inflated fall unambiguously within this language because they indisputably rest on the same core factual predicate as claims that brokerage commissions were inflated—specifically, the predicate that an antitrust conspiracy existed to inflate brokerage commissions. No reasonable person could conclude otherwise, and hence there is no ambiguity. *See Brown*, 601 S.W.3d at 560 (to be ambiguous, language must be "reasonably susceptible of more than one construction giving the words their plan meaning as understood by a reasonably average person").[5]

---

[5] Mullis's invocation of "the doctrine of *contra proferentem*" fails for two reasons. (Mullis.Br.48-49.) First, and dispositively, the settlement agreement expressly rejects it. (Mullis.App.274; R.Doc.1192-3 at 25.) Second, the doctrine "is employed only as a last resort when other available data bearing on the agreement shed[s] no light on actual intent or meaning." *Rathbun v. CATO Corp.*, 93 S.W.3d 771, 781 (Mo. Ct. App. 2002). No such void exists here.

Looking outside the release's language, Mullis argues that the release is "latently ambiguous" because statements by the settling parties' counsel supposedly suggested that the release did not cover claims based on home purchases. (Mullis.Br.50-55.) But Mullis cites no case where a court has used extrinsic *lawyer* statements about a contract to override what the contract plainly says. In each of the cases he cites, the court found an agreement "latently ambiguous" because either: (1) the agreement did not address the relevant question or failed to define a key term (*Prot. Life Ins. Co. v. Jim Orr & Assocs.*, 384 F.3d 949, 951 (8th Cir. 2004); *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 362 (Mo. 1991)); or (2) the agreement addressed the relevant question but its terms conflicted with governing law and so could not be enforced (*Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 337-38 (Mo. 1996)). Neither of those circumstances is present here. The settling parties' intent is clear, that intent is reflected in the release's terms, and nothing in the release violates governing law.

The extrinsic evidence Mullis cites (Mullis.Br.51-54) does not contradict the scope of the release in any event.

**The September 21, 2023 *Batton* status hearing.** At this hearing, RE/MAX's counsel simply confirmed that RE/MAX was not seeking to stay the *Batton* case in its entirety due to the settlements. (SpringWay.App.854-55; R.Doc.1447-2 at 14-15.) Because that case includes plaintiffs who are ***not*** part of the settlement classes— namely, people who ***only*** bought homes during the relevant period—there was no basis for a complete stay.

**Plaintiffs' December 27, 2023 JPML Reply Brief.** This brief merely noted that the *Batton* action, among others, "differ[ed] in other respects from the actions Movants [Plaintiffs] seek to consolidate," before adding that "movants do not object to the centralization of those additional actions." (Mullis Mot. to Supplement Record, Ex. 6 at 12.) The brief made no comment about the scope of the settlement release.

**April 11, 2024 Email from Anywhere's Counsel.** This three-sentence email advised Mullis's counsel that, if Mullis had a "potential objection" to the settlements "based on the scope of the releases," he "must . . . file[]" that objection "by April 13, 2024." (Mullis Mot. to Supplement Record, Ex. 3.) The email made no comment about the scope of the settlement release.

**May 9, 2024 Final Approval Order.** The court's order states that the release "extends to claims arising from or relating to transactions where Settlement Class Members either sold or purchased a home." (Mullis.App.531-32; R.Doc.1487 at 30-31; Mullis.Add.30-31.) This is correct and wholly consistent with the scope of the release.

In sum, the parties unambiguously agreed to release all class members' claims arising out the same alleged antitrust conspiracy, whether as either sellers or buyers.

> **b.    Nothing prevents class members from releasing all their claims arising out of the same alleged conspiracy.**

Under Eighth Circuit law, the parties were entirely within their rights to settle all claims arising out of the alleged conspiracy. The rule is that a class representative

may release claims that "rest on the same or similar facts as the class action claims," *Thompson*, 992 F.2d at 191 n.6, provided "there is a realistic identity of issues between the settled class action and the subsequent suit," *id.* at 191 (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982)).

"There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this." *Gen. Am. Life*, 357 F.3d at 805. Thus, in *General American Life*, this Court enforced a release covering "modal billing practices" that "were never specifically at issue in the class action" because billing practices generally were challenged. *Id.* at 804-05. Likewise in *In re Uponor, Inc. F1807 Plumbing Fittings Products Liability Litigation*, this Court enforced a release of all claims relating to the brass fittings alleged to be defective, rejecting the argument that this was "an overbroad release clause." 716 F.3d 1057, 1065 (8th Cir. 2013). Mullis has not asked this Court to change Eighth Circuit law, and a panel would have no authority to do so in any event. *See United States v. Hataway*, 933 F.3d 940, 946 (8th Cir. 2019) ("[O]ne panel cannot overrule an opinion filed by another panel.").

Consistent with this Court's precedent, antitrust settlements both within and outside the Circuit routinely release all claims arising out of the alleged conspiracy, including both direct- and indirect-purchaser claims. (*See* Mullis.App.528; R.Doc.1487 at 27; Mullis.Add.27 (collecting many examples).) That is what the parties did here: they agreed that class members would release all their claims arising out of the alleged

conspiracy to inflate broker commissions, including both their direct-purchaser claims as sellers who paid the commissions and indirect-purchaser claims as buyers who purchased homes whose price may have been affected by the commissions. Because both sets of claims "rest on the same or similar facts," the parties were perfectly within their rights to settle them. *Thompson*, 992 F.2d at 191 n.6.

Mullis argues that the release was barred by the Second Circuit's decision in *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981), which he characterizes as limiting releases to claims relying on the "identical factual predicate." (Mullis.Br.40-46.[6]) The *Super Spuds* decision is not controlling in this Circuit, it is factually inapposite, and Mullis overstates its holding in any event. In *Super Spuds*, the court refused to apply a class settlement release to claims that (1) the named plaintiffs did not possess; (2) the class plaintiffs' lawyers did not agree were released; (3) the class notice did not address; and (4) did not rest on the same facts as the plaintiffs' claims. In every respect, this case is different.

First, in *Super Spuds* the named plaintiffs did not possess the claims defendants argued were released. Plaintiffs asserted fraud claims based on potato future contracts that were liquidated between April 13 and May 17, arguing that the price had been unlawfully depressed. 660 F.2d at 16-17. The defendant New York Mercantile

---

[6] In *Matsushita Electric Industrial Co. v. Epstein*, 516 U.S. 367, 377 (1996), the Supreme Court noted that Delaware state courts apply a version of this doctrine. (Mullis.Br.40 (citing *Matsushita*).) The Supreme Court did not itself adopt the doctrine. *See* 6 Newberg & Rubenstein on Class Actions § 18:19 (6th ed. 2024).

Exchange argued that the class release should also apply to breach-of-contract claims based on contracts that were *not* liquidated in that period and under which the Exchange failed to deliver the promised potatoes. *Id.* at 13. The class plaintiffs "themselves held no unliquidated contracts after May 7." *Id.* at 17. Hence, the court held they could not represent people who did. *Id.* As the Second Circuit later explained, "*Super Spuds* hinged on the fact that the class representative did not possess the unliquidated futures." *Wal-Mart*, 396 F.3d at 111. Thus, in *Wal-Mart*, the Second Circuit approved an antitrust class action settlement over an objection that it wrongly released boycott claims in addition to tying claims because the lead plaintiffs *did* possess the released antitrust claims. *Id.* The same is true here. Several named plaintiffs both bought and sold homes during the class period. They held all the antitrust claims at issue and were entitled to settle those claims.

Second, in *Super Spuds*, counsel for the class plaintiffs maintained that it "was not the intention of the class plaintiffs" to release claims based on unliquidated contracts, and "he would so testify" if necessary. 660 F.2d at 14-15. Here, in sharp contrast, class counsel (on behalf of Plaintiffs) have acknowledged—and the district court found—that a release of all claims was an express, agreed-to term of the settlement, and a necessary one to secure relief for the class.

Third, in *Super Spuds*, the "notice subsequently sent to class members . . . referred only to claims based on liquidated contracts; it gave no indication that the action would concern any other claims." *Id.* at 17. Here, in contrast, the notice repeats

verbatim the release language that unambiguously applies to homebuyer claims. (*Compare* Mullis.App.262; R.Doc.1192-3 ¶ 32 (extending release to "claim[s] that a class member paid an excessive commission or home price due to the claims at issue in these Actions") *with* Cheatham.App.385; R.Doc.1469-3 at 76 (class notice quoting release verbatim).) In *Thompson*, this Court enforced a class release and found *Super Spuds* inapplicable when "appellant had sufficient notice of the terms of the proposed settlement" and a chance to opt out. *Thompson*, 992 F.2d at 191. In *General American Life*, this Court enforced another class release and found *Super Spuds* distinguishable because there the "settlement agreement enlarged the scope of the claims to be released without giving notice to the class members," whereas in the case before it "the Notice is as broad as the settlement itself." *Gen. Am. Life*, 357 F.3d at 804-05. This case is controlled by *Thompson* and *General American Life*.

Fourth, in *Super Spuds*, there was a mismatch between the material facts required for the litigated and additional released claims. The litigated fraud claims depended on omissions and representations that depressed the prices of liquidated futures contracts. The additional released contract claims, in contrast, depended on failures to deliver potatoes. *Super Spuds*, 660 F.2d at 13 n.4. Here, there is no such mismatch. All the claims are antitrust claims, they all depend on the same alleged antitrust conspiracy, and indeed the claims for inflated home prices depend on proof that there were first inflated broker commissions. *See Leeder*, 601 F. Supp. 3d at 308-11 (recognizing this interplay between the claims in dismissing the *Batton* federal antitrust

claims). In *Wal-Mart*, the Second Circuit had no trouble concluding that antitrust tying

and boycott claims both arose "out of the same factual predicate," and therefore

could both be released. 396 F.3d at 108. Here, likewise, claims based on home sales

and home purchases made *by the very same people* arise out of the same factual predicate

and can both be released.

Indeed, here the claims are so closely related that Plaintiffs' arguments made in

their role as sellers limit the arguments they can make in their role as buyers. At

summary judgment below, to maximize their damages, the *Burnett* Plaintiffs argued

that when they were sellers they did not pass on any overcharges to buyers and hence

did not mitigate any of the allegedly inflated broker commissions they paid by

receiving higher home prices from the buyers. *See Burnett v. Nat'l Ass'n of Realtors*, 2022

WL 17741708, at *11 (W.D. Mo. Dec. 16, 2022). Given that they prevailed on this

theory as sellers, they would be judicially estopped from later arguing the opposite as

buyers—that some of the allegedly inflated commissions were in fact passed on. *See*

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("judicial estoppel . . . generally

prevents a party from prevailing in one phase of a case on an argument and then

relying on a contradictory argument to prevail in another phase"); *accord Stallings v.*

*Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006). This is all the more reason why

plaintiffs who both sold and bought houses were clearly able to release all their claims.

In sum, courts commonly recognize that class settlements of antitrust claims

can release all claims the class members have arising out of the same alleged

conspiracy, including both direct- and indirect-purchaser claims. Were the rule otherwise, "any Class Member bound by the release" in a direct purchaser settlement could turn around and "file a new lawsuit asserting indirect purchaser claims under state law" arising out of the same conspiracy. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 4224160, at *15 n.16 (E.D.N.Y. Sept. 18, 2024), *appeal docketed*, No. 24-2678 (2d Cir.). "Such a result would permit potentially duplicative recovery for class members and would undermine the ability of a defendant to achieve global peace by obtaining releases from those who might wish to assert claims, meritorious or not." *Id.* This is precisely why Anywhere and RE/MAX found partial releases intolerable and why Plaintiffs agreed to full releases. And of course, if Mullis truly disliked the settlements' release, he was free to opt out and pursue his own claims. His failure to do so is telling.

Mullis's only other cited case, *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg. Sales Pracs. & Prods. Liability Litig.*, 91 F.4th 174 (4th Cir. 2024), is irrelevant. There, the Fourth Circuit held that a class settlement resolving a "series of civil actions . . . related to the sale and marketing" of the company's flooring products did not bar a class member's children from bringing a "wrongful death claim" against the company. *Id.* at 177-80. Here, no one is claiming that the settlements release wrongful death claims. (*See* Mullis.App.262; R.Doc.1192-3 ¶ 32 (settlement providing that the release does not affect claims for "personal or bodily injury").)

### 3. The district court properly rejected Mullis's request for separate representation and subclasses.

Mullis next argues that if class members who both sold and bought houses were allowed to settle all their claims they had to be separately represented from people who only sold houses. (Mullis.Br.32-40.) This argument is incorrect because all class members were entirely aligned in seeking the maximum total recovery from Anywhere and RE/MAX in settlement. Mullis's real argument seems to be that different interests may arise when it comes time to allocate the settlement funds among class members. But that argument is premature because allocation has not yet been addressed, and allocation will have no effect on whether the settlement is fair, reasonable, and adequate as between Plaintiffs and Defendants.

A subclass and separate representation are required only if there is a "fundamental" "conflict[] of interest between named parties and the class they seek to represent." *Target*, 892 F.3d at 975-76. A fundamental conflict does not arise simply because one set of class members holds additional, or "better," claims than other class members. *See, e.g.*, *id.* (no fundamental conflict between actual damages class members and uninjured class members); *Gen. Am. Life*, 357 F.3d 800 at 805 (same, for class that included members with both "premiums" claims and additional unpleaded "modal-billing claims"). Rather, a fundamental conflict exists where the "injuries" suffered by the class are "*extraordinarily* various, both in terms of the harm sustained and the

duration endured," such that there is a "*substantial* difference in remedial needs."
*Petrovic*, 200 F.3d at 1146-48 (emphases added).

The paradigmatic examples are the Supreme Court's decisions in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). In those cases, the Supreme Court reversed the approval of broad asbestos class settlements encompassing both "present injury" plaintiffs *and* "future injury" plaintiffs. Because a "stark" "conflict existed between" the remedial interests of the former ("who would want to maximize immediate payout") and the latter ("who would want to maximize testing, protection from inflation, and future fund size"), the Supreme Court required the creation of subclasses represented by separate counsel. *Petrovic*, 200 F.3d at 1146 (describing both cases).

This case is nothing like that. Future claims are not at issue, and the interests of people holding both homeseller and homebuyer claims were directly represented because several of the named Plaintiffs both bought and sold homes within the class period. That personal stake alleviates any concerns about conflicts of interest or adequacy of representation. *See Petrovic*, 200 F.3d at 1146-47 (rejecting analogous argument where the "class representatives included" plaintiffs holding the allegedly "conflicting" sets of claims); *see also Wal-Mart*, 396 F.3d at 111 (same, and noting that where "the lead plaintiffs are necessarily a part of the" allegedly conflicting "subclasses" "their interests are . . . aligned with the interests of those [sub]classes").

Even taking the analysis further, beyond what Eighth Circuit precedent requires, there is no "fundamental" conflict among class members. Indeed, Mullis's counsel appears to recognize this, as their *Batton* complaint does not divide the putative nationwide class of homebuyers into "subclasses" of "homebuyer-only claimants" and "mixed homebuyer-and-homeseller claimants." (*See* Mullis Mot. to Supplement Record, Ex. 2 at 37 (purporting to represent a single putative class).) *See also Batton*, 2024 WL 689989, at *10 (dismissing the *Batton* plaintiffs' claim for Sherman Act "injunctive relief" because Plaintiffs were already seeking that relief in the now-settled cases). That Mullis speculates (without any factual basis) that he would have used homebuyer claims to greater effect in negotiations than Plaintiffs reflects at most a strategic difference among counsel, not a "fundamental conflict" among the class. *See Target*, 892 F.3d at 975-76; *Gen. Am. Life*, 357 F.3d 800 at 805; *Petrovic*, 200 F.3d at 1147-48; *see also Wal-Mart*, 396 F.3d at 113 (rejecting analogous argument in antitrust settlement context and emphasizing that "adequate representation of a particular claim is determined by the alignment of interests of class members, not by proof of vigorous pursuit of that claim").

Mullis cites no case finding a fundamental conflict on facts like the ones presented here. Other than the readily distinguishable *Amchem* and *Ortiz* decisions, addressed above, the only case Mullis cites in support of his position is *In re Literary*

*Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011).[7] Mullis's heavy

reliance on this case is surprising, as he did not cite it in either his objection or at the

fairness hearing. Regardless, the case is far afield. *Literary Works* involved a unique

allocation structure that explicitly pitted "more valuable" claims held by a few class

members ("Category A and B claims") against "less valuable" claims held by "99%"

of class members ("Category C claims"). *Id.* at 246, 250-51. "If the total of all claims

. . . exceed[ed]" a certain cap, the compensation for Category C claimants would be

reduced to "zero" *before* compensation was reduced for Category A or B claimants *at

all. Id.* at 246. This case is completely different. No "members of the class will have

their ability to get settlement benefits reduced to zero because some other members

got more relief from the settlement." *In re Equifax Customer Data Sec. Breach Litig.*, 999

F.3d 1247, 1277 (11th Cir. 2021) (distinguishing *Literary Works* on this basis and

substantially affirming settlement). To the contrary, *every* class member who submits a

valid claim will receive monetary relief—even if the ultimate allocation plan

determines the amount solely by reference to broker fees paid by home sellers—

because by definition *everyone* included in the settlement class sold a home within the

class period and paid brokerage fees. That *some* class members both bought and sold

---

[7] Mullis cites *Professional Firefighters Ass'n of Omaha v. Zalewski, Loc. 385* for the
proposition that a district court does not abuse its discretion in approving a settlement
with subclasses. 678 F.3d 640, 647 (8th Cir. 2012). But nothing in that decision
suggests subclasses are *mandatory*, much less subclasses represented by "separate
counsel." (Mullis.Br.39.) Indeed, in *Zalewski*, this Court affirmed the settlement even
though the subclasses were *not* represented by separate counsel.

homes does not change the fact that *all* class members sold homes and hence will always be eligible for monetary relief. The lack of "separately stated consideration" for related, released claims is not evidence of class representatives' "inadequacy." *Gen. Am. Life*, 357 F.3d 800 at 805. Nor is a lack of specific reference to the *Batton* case in the settlement notice. *See Roes*, 944 F.3d at 1045 ("[D]eclining to include the information" about other related cases in a settlement notice does "not contravene . . . due process[.]'").

As the district court found, the class members were adequately represented. This finding was well within the court's discretion.

### 4. The district court properly determined that the settlements themselves were fair and created a separate process for setting a plan of allocation.

Finally, Mullis argues that the district court essentially could not consider whether the settlements "treat[] class members equitably relative to each other" under Rule 23(e)(2)(D) because Plaintiffs had not yet "proposed an allocation plan" detailing how the settlement funds will be divided among class members. (Mullis.Br.26-28.) This is incorrect for two key reasons.

First, the district court could, and did, consider the settlement agreements themselves and see that they treated class members equitably. Plaintiffs specifically addressed this factor in their motion in support of final approval and highlighted that "the Settlements treat Class Members fairly and equitably relative to each other" because "[n]o class members is treated differently from any other," "[t]he practice

change relief applies to all Class Members," and "[w]ith respect to monetary relief, every individual with a transaction that falls within the class definition is eligible to submit a claim." (Cheatham.App.246; R.Doc.1469 at 27.) Recognizing this, the district court found that the "settlement proceeds will be distributed equitably and reduced on a pro rata basis" based on the total claims submitted. (Mullis.App.508, 518; R.Doc.1487 at 7, 17; Mullis.Add.7, 17 (citing Rule 23(e)(2)).)

Second, to the extent that a future proposed allocation plan could ever raise intra-class equity concerns that do not exist under the settlement itself, the district court correctly established a separate process for addressing them. Before funds are distributed to class members, Plaintiffs' counsel are required "to prepare and submit for Court approval a plan of allocation for the Settlement Fund, and to propose a schedule for comment and Court review." (Mullis.App.539-40; R.Doc.1487 at 38-39; Mullis.Add.38-39.) The "proposed plan" will be posted on the settlement website and "emailed to all individuals who submit a claim in order to provide those individuals an opportunity to comment on the plan." (*Id.*) "After the plan of allocation is proposed and an opportunity to comment has been provided," the court will decide whether to approve it. (*Id.*) This approach amply satisfies a district court's duty to "consider[] whether" a settlement "treats class members equitably relative to each other" before it finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

To the extent Mullis argues for a bright-line rule that class settlements cannot be approved until a plan of allocation is set, that argument is foreclosed by precedent,

which recognizes that deferral is often required when multiple settlements with different defendants will arise out of the same alleged antitrust conspiracy and provide money to be distributed to the same class members. As the district court noted, "courts frequently approve class settlements and allocation plans separately," particularly "when, as here, there are multiple defendants, only some have settled, and additional settlements may add to the fund to be distributed." (Mullis.App.516-17; R.Doc.1487 at 15-16; Mullis.Add.15-16 (collecting cases).) At the final approval stage, the district court's "prime function" is "to determine that the amount" the settling defendant is paying the class is "fair, reasonable, and adequate" and is "commensurate with the value of the case." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d Cir. 1987). How Plaintiffs and their counsel choose to allocate those funds *among* the class is a different question that, in a case of this nature, can properly wait until after all significant settlements have been finalized and the total pot of money to be divvied up is set.

This Court's decision in *Petrovic* is instructive. There, an objector argued, similar to Mullis here, that a class settlement notice was unfair because "it did not say how" the total settlement fund "would be distributed among the individual members of the class." 200 F.3d at 1152-53. The objector argued this was problematic because some class members had different, and potentially stronger, claims than other class members. *Id.* at 1145-46. Rejecting this argument, the Court affirmed the district court's final approval order. The notice "provided a reasonable summary of the stakes

of the litigation"—*i.e.*, "the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages"—and also provided class members contact information where they could "acquire more detailed information." *Id.* at 1153. "Due process," the Court observed, "require[d] no more." *Id.* So too here. The notice provided just as much information as the notice in *Petrovic.* (Mullis.App.517-18; R.Doc.1487 at 16-17; Mullis.Add.16-17.) In addition, the process set by the district court for reviewing and approving the allocation plan provides class members even greater due process protections than in *Petrovic.*

Mullis cites no case denying approval of a class settlement because consideration of an allocation plan was deferred pending approval of other related settlements. The few cases Mullis cites in this section of his brief concerned class settlements where there was a "fundamental conflict" among class members, such that the class representatives and counsel could not be trusted to *ever* reach an "equitable" allocation decision (at least not without separate representation and subclasses). *See Ortiz,* 527 U.S. at 856-57; *Amchem,* 521 U.S. at 611; *cf. In re Target Corp. Customer Data Sec. Breach Litig.,* 846 F.3d 608, 615-16 (8th Cir. 2017) (initially reversing class settlement approval based on this concern before affirming in a subsequent decision). Because there is no such fundamental conflict here among class members, these authorities are inapposite.

**B.     The Cheatham objection fails.**

The Appellee briefs of Plaintiffs and Keller Williams thoroughly explain why the Cheatham objection is meritless. Anywhere and RE/MAX add the following supplemental points.

**1.     The settlement notice was adequate.**

Cheatham objects on appeal to the adequacy of the settlement notice. (Cheatham.Br.17-19.) Cheatham did not raise this objection below, so it is forfeited. *N. Bottling Co.*, 5 F.4th at 922-23.

Regardless, the district court correctly found that the notice complied with Rule 23 and due process. Rule 23(c)(2)(B) lists seven items that a settlement notice must address: (i) "the nature of the action," (ii) the class definition, (iii) "the class claims, issues, or defenses," (iv) a class member's right to appear through an attorney, (v) a class member's right to opt out of the settlement, (vi) "the time and manner for requesting exclusion," and (vii) "the binding effect of a class judgment[.]" The notice here contained all of this information, and Cheatham does not claim otherwise. The district court thus correctly found that the notice "fully and accurately informed members of the Settlement Class of all material elements of the Settlements" and satisfied Rule 23(c)(2)(B). (Mullis.App.504; R.Doc.1487 at 3; Mullis.Add.3.)

**2.     The settlements provide substantial monetary relief.**

Cheatham's suggestion that the settlements offered class members inadequate compensation also fails. (Cheatham.Br.23.) Cheatham does not acknowledge that the

settlements paved the way for subsequent settlements that have brought the total class recovery to $1 billion. (*See, e.g.*, SpringWay.App.1300-02; R.Doc.1478 at 12-14 (collecting settlements).) Nor does he acknowledge that the settlements captured a significant proportion of the cash that Anywhere and RE/MAX had on hand at the time of settlement. (*See* SpringWay.App.1312-14; R.Doc.1478 at 24-26; SpringWay.App.1281; R.Doc.1473 at 6.) "[T]hat a settlement provides only a portion of the potential recovery does not make [it] unfair, unreasonable or inadequate." *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017). Class settlements are not meant to be "fatal" to a defendant's "corporate viability." *Grunin*, 513 F.2d at 125.

### 3. The release of franchisees is valid.

Cheatham's objection to the settlements' treatment of Anywhere and RE/MAX's franchisees is baseless. (Cheatham.Br.24-26.) Cheatham either ignores or fails to see that many of the companies' practice changes are likely to alter franchisee operations. (Mullis.App.511-13, 524-26; R.Doc.1487 at 10-12, 23-24; Mullis.Add.10-12, 23-24.) The settlements' requirements that Anywhere and RE/MAX "recommend and encourage" franchisees to adopt changes simply reflects the reality of limits on franchisors' rights of control. (*Id.*) And the district court correctly found the settlements' cumulative benefits "substantial." (*Id.*) Cheatham identifies no abuse of discretion in these findings.

Cheatham cites no authority for the notion that non-party franchisees must contribute to a settlement to be included within the scope of a release, when a

franchisor has paid for that release. "[A] liability release [need not] only encompass those defendants who made a concrete contribution to the settlement[.]" *In re Hewlett-Packard Co. S'holder Deriv. Litig.*, 716 F. App'x 603, 608 (9th Cir. 2017). That is why courts regularly approve class settlements that release corporate affiliates or franchisees from liability. In *Wal-Mart*, for example, the Second Circuit affirmed a release covering "member banks" who "were not parties to th[e] action" because class settlements often "release[] claims against non-parties where . . . the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." 396 F.3d at 108-09. As the district court reasonably concluded, that is the case here. (Mullis.App.524-26; R.Doc.1487 at 23-25; Mullis.Add.23-25.)

### C. The Spring Way objection fails.

Plaintiffs and Keller Williams also demonstrate the lack of merit in Spring Way's objection. Anywhere and RE/MAX offer two additional points.

### 1. The settlements cannot be judged by the subsequent verdict.

Spring Way erroneously compares the Anywhere and RE/MAX settlements to the $1.78 billion verdict Plaintiffs secured. (SpringWay.Br.5-6, 15-16.) But Anywhere and RE/MAX settled before that verdict, and settlements are evaluated based on "what was known to the settling parties at the time the agreement was reached . . . , not the risks or absence of risks that arose after the settlement." *Trombley v. Nat'l City*

*Bank*, 826 F. Supp. 2d 179, 203 (D.D.C. 2011); *accord In re Cendant Corp. Litig.*, 264 F.3d 201, 238 (3d Cir. 2001) (the fairness inquiry "attempts to measure the expected value of litigating the action rather than settling it"). Spring Way wrongly ignores this settled rule.

### 2. The final approval order complied with Rule 23(e)(2)(C)(ii).

Spring Way's passing suggestion that the district court did not consider the effectiveness of the proposed method of distributing relief to the class and method of processing class-member claims, as required by Rule 23(e)(2)(C)(ii), is meritless. (SpringWay.Br.16.) Spring Way did not raise this issue below and therefore forfeited it. *N. Bottling Co.*, 5 F.4th at 922-23. Regardless, the district court carefully reviewed the notice and claims process described by Plaintiffs' claims administrator and found it had been "extremely successful" and "fully satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law." (Mullis.App.503-04, 515; R.Doc.1487 at 2-3, 14; Mullis.Add.2-3, 14.) This review fulfilled Rule 23(e)(2)(C)(ii)'s purpose of ensuring that the notice and claims process "facilitate[d] filing legitimate claims" and "defeat[ed] unjustified claims" without being "unduly demanding." Adv. Comm. Note to 2018 Amend. to Rule 23.

### CONCLUSION

The district court's judgment dated May 9, 2024 should be affirmed.

Dated: December 11, 2024

**FAEGRE DRINKER BIDDLE & REATH LLP**

/s/ Aaron D. Van Oort
Aaron D. Van Oort
Kevin P. Wagner
Hannah M. Leiendecker
Anderson C. Tuggle
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Aaron.VanOort@faegredrinker.com
Kevin.Wagner@faegredrinker.com
Hannah.Leiendecker@faegredrinker.com
Anderson.Tuggle@faegredrinker.com

Stacey Anne Mahoney
**MORGAN LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000
Stacey.Mahoney@morganlewis.com

Kenneth M. Kliebard
**MORGAN LEWIS & BOCKIUS LLP**
110 North Wacker Drive
Chicago, IL 60606
Tel: (312) 324-1000
Kenneth.Kliebard@morganlewis.com

William T. McEnroe
**MORGAN LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5001
William.McEnroe@morganlewis.com

*Counsel for Anywhere Real Estate Inc. (f/k/a Realogy Holdings Corp.)*

Dated: December 11, 2024

**JONES DAY**

/s/ Jeffrey A. LeVee
Jeffrey A. LeVee
555 S. Flower Street
Los Angeles, CA 90071
Tel: (213) 489-3939
jlevee@jonesday.com

Eddie Hasdoo
**JONES DAY**
110 North Wacker Drive
Chicago, IL 60606
Tel: (312) 269-4214
ehasdoo@jonesday.com

*Counsel for RE/MAX, LLC*

# CERTIFICATE OF COMPLIANCE AND VIRUS SCANNING

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains a total of 12,990 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, in 14-point Garamond.

Pursuant to Local Rule 28A(h)(2), I certify that the Brief and the Addendum have been scanned for viruses and are virus-free.

Respectfully submitted,

*/s/ Aaron D. Van Oort*
Aaron D. Van Oort

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2024, I filed the foregoing brief using the

Court's CM/ ECF system. I further certify that, once the Court accepts this brief for

filing, I will file via UPS Overnight ten copies of the brief with the Clerk of Court for

the United States Court of Appeals for the Eighth Circuit at the following address:

Michael E. Gans, Clerk of Court
U.S. Court of Appeals – 8th Circuit
Thomas F. Eagleton Courthouse
111 South 10th Street
Room 24.329
St. Louis, MO. 63102

*/s/ Aaron D. Van Oort*
Aaron D. Van Oort